IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 25–11–BU–DLC |
| Plaintiff, | |
| vs. | ORDER |
| NATHAN VAL CHELINI, | |
| Defendant. | |

Before the Court are Defendant Nathan Val Chelini's motion to dismiss Count 1 (Doc. 15) and motion to dismiss indictment for failure to preserve exculpatory evidence (Doc. 17). On July 14, 2025, the Court held a hearing on the motions. (Doc. 28.) For the reasons herein, the motion to dismiss indictment for failure to preserve exculpatory evidence (Doc. 17) is GRANTED. Defendant's motion to dismiss Count 1 (Doc. 15) is DENIED as MOOT.

## BACKGROUND

On June 24, 2024, Lieutenant Bryce Foley[1] of Butte Silver Bow Law Enforcement Department ("BSBLED") was dispatched to 4500 Saddle Rock Road in Butte, Montana, after BSBLED received a report of multiple gunshots in the

_____

[1] At the time of the events that form the basis of the indictment in this matter, Lieutenant Foley was a Sergeant. He has since been promoted to the role of Lieutenant.

area. (Doc. 18-1 at 1.) Lieutenant Foley positioned his vehicle at the driveway entrance and announced his police presence using an intercom. (*Id.*) Lieutenant Foley advised that he was the Butte Police and requested that anyone inside come out. (*Id.*) Lieutenant Foley observed two campers and two buildings, and after announcing his presence through the intercom, Lieutenant Foley saw a male—later identified as Thomas Jessen—step out of one of the campers. (*Id.*) Jessen ran back into the camper after noticing law enforcement. (*Id.*) Sergeant Tim Berger arrived on the scene and the officers continued to announce their presence. (*Id.*)

A second male—Defendant Nathan Chelini—exited a different camper and approached the officers. (*Id.*) The officers asked Defendant about the reported gunshots; Defendant denied knowing about or hearing any gun shots. (*Id.*) Defendant informed the officers that he and Jessen were the only people present on the property. (*Id.*)

The officers continued to demand that Jessen exit the trailer but Jessen refused to come out. (*Id.*) Defendant offered to assist the officers and ultimately Defendant was able to convince Jessen to come out of the camper. (*Id.* at 2.) Lieutenant Foley placed Jessen in his patrol vehicle so that the officers could search the area. (*Id.*)

Upon searching the area surrounding the camper Jessen had been in, officers located 14 casings belonging to a .223 bullet, as well as a scope cover. (*Id.*)

2

Officers also located a female—Megan Yuhas—in a vehicle on the property. (*Id.*)
Yuhas stated that she did not hear gunshots but that she knew there were guns on
the property. (*Id.*) Yuhas told the officers that Defendant had guns in his camper
and hides them under his bed. (*Id.*)

Lieutenant Foley then asked Jessen about the casings they found. (*Id.*) Jessen
stated that he does not have any guns, and if there are guns on the property, they
are not his. (*Id.*)

Lieutenant Foley then approached Defendant and told him that Jessen had
acknowledged that there were guns on the property. (*Id.*) Defendant stated, "I don't
have any guns." (*Id.*) Lieutenant Foley told Defendant that neither Yuhas nor
Jessen denied that there were guns on the property. (*Id.*) Defendant responded that
the guns were obviously not his. (*Id.*)

The officers were then dispatched to another gunshot call at a different
location. (*Id.*)

Later that day, Lieutenant Foley was dispatched to 4392 Saddle Rock Road
to investigate a report of bullet holes found on the side of a residence. (*Id.*) Upon
arrival, Mr. Kevin Norman advised that he had heard shooting earlier in the
morning and believed that the sound was coming from his neighbors at 4500
Saddle Rock Road. (*Id.*) Mr. Norman discovered a bullet hole in the south-facing
side of his attached garage, and a second bullet hole in another exterior wall facing

3

his kitchen. (*Id.* at 3.) The trajectory of the bullet holes was consistent with gunfire originating from the direction of 4500 Saddle Rock Road. (*Id.*)

Based on Mr. Norman's report and the evidence of bullets striking Mr. Norman's residence, officers obtained a search warrant for the property at 4500 Saddle Rock Road. (*Id.* at 8–9.) During the execution of the search warrant, officers located three firearms in Defendant's trailer: (1) a Keltec Model P17 .22 caliber pistol; (2) a Diamondback Model DB015 5.56 caliber rifle; and (3) a Umarex (HK) Model MP5 .22 caliber pistol. (*Id.* at 3.)

According to Lieutenant Foley's report, on June 8, 2024, Jessen left a voicemail on Lieutenant Foley's phone stating that he wanted to speak with Lieutenant Foley because the guns that were taken from Defendant's trailer "belonged to" Jessen. (*Id.*) Law enforcement did not preserve the voicemail. (Docs. 18 at 6, 25 at 3.) Lieutenant Foley did not return Jessen's call because he did not feel that Jessen's statement pertained to the case.

Approximately three months later, Jessen was charged with 32 counts of child sexual abuse. (*See* Doc. 26-1.)

On April 23, 2025, Defendant was indicted for being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 1) and possession of an unregistered firearm, in violation of 26 U.S.C. § 5681(d) (Count 2). (Doc. 1.) On June 17, 2025, Defendant filed the present motion, arguing that

the indictment should be dismissed for failure to preserve exculpatory evidence. (Doc. 17.)

On June 30, 2025, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Jacqui Sutton and Butte-Silver Bow Detective Ryan Hardy interviewed Jessen. (Docs. 25 at 3, 26 at 2.) In that interview, Jessen admitted that he left the June 8, 2024, voicemail, but claimed that the guns were not in fact his. (*Id.*)

## LEGAL STANDARD

The Due Process Clause of the Fourteenth Amendment requires the Government to preserve evidence that is material to the defense and possessed by the Government. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). "[T]he government violates the defendant's right to due process if the unavailable evidence possessed 'exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). In *Youngblood*, 488 U.S. at 57–58, the Supreme Court "added a third requirement for establishing a due process violation, holding that the defendant must demonstrate that the government acted in bad faith in failing to preserve the potentially useful evidence." *United States v. Zaragoza-Moreira*, 780

F.3d 971, 977 (9th Cir. 2015). However, as the Ninth Circuit has explained, "the bad faith inquiry . . . turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Zaragoza-Moreira*, 780 F.3d at 979 (9th Cir. 2015) (internal quotations and citation omitted). In other words, if the government is aware of the potentially exculpatory value of the evidence before it was destroyed, bad faith is assumed. *See id.* at 979–80.

**DISCUSSION**

Defendant argues that Jessen's June 8, 2024 voicemail is exculpatory to Defendant and the exculpatory value was readily apparent to the Government. (Doc. 18 at 6.) Therefore, according to Defendant, the Government's failure to preserve the voicemail violates Defendant's Due Process Rights. (*Id.*)

## I.     Whether the Voicemail was Exculpatory to Defendant

Exculpatory evidence is any evidence that tends to prove the innocence of the defendant. *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014). Defendant argues that the voicemail meets this standard because the voicemail undermines the Government's theory that Defendant knowingly possessed firearms. (Doc. 26 at 6.) Further, according to Defendant, the voicemail "would have provided powerful impeachment material under [*Giglio v. United States*, 405 U.S. 150, (1972),] considering Jessen's shifting statements and his evolving motive to testify against Chelini." (*Id.*)

6

The Government counters that "Jessen's statement that he 'owned' the firearms" is irrelevant, because "[w]hile ownership may show possession, ownership alone is insufficient to prove the charge." (Doc. 25 at 8 (citing *United States v. Casterline*, 103 F.3d 76, 78 (9th Cir. 1996).) In other words, a statement that Jessen "owned" the firearms does not necessarily exculpate Defendant of knowingly possessing the firearms.

In Reply, Defendant argues—and the Court agrees—that the Government's definition of exculpatory is far too narrow. (Doc. 26 at 6.) As the Supreme Court of the United States has explained, exculpatory evidence is evidence that is "material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). And importantly here, "[i]mpeachment evidence is exculpatory evidence within the meaning of *Brady*." *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) (citing *Giglio*, 405 U.S. at 154).

The Court highlights that the precise language used in the voicemail cannot be confirmed because the voicemail has been deleted. Lieutenant Foley's supplemental report from June 7, 2024, states "[O]n 06/08/2024 I had a message form [sic] Thomas [Jessen] on my voicemail. He was saying that he wanted to speak to me because the guns that were taken from Nathan [Chelini's] trailer belonged to him." (Doc. 18-1 at 3.) Curiously, the supplemental report is dated the day before Jessen reportedly left the voicemail. While this discrepancy likely

amounts to nothing more than a scrivener's error, the inconsistency demonstrates that the best evidence is the voicemail itself, not a report of the voicemail. Without the voicemail, there is no way to verify whether Jessen claimed ownership, as insisted by the Government, or whether he asserted exclusive possession over the firearms. And, even if Jessen merely claimed "ownership" of the firearms in the voicemail, that admission could mitigate the Government's theory that Defendant knowingly possessed the firearms. When questioned by law enforcement, both Defendant and Jessen denied having any weapons. (Doc. 18-1 at 2.) While the firearms were ultimately found in Defendant's trailer, a statement that the firearms "belonged to" Jessen could undermine Defendant's culpability.

## II.    Whether the Value of the Voicemail was Readily Apparent to Lieutenant Foley

"Youngblood's bad faith requirement dovetails with the first part of the Trombetta test: that the exculpatory value of the evidence be apparent before its destruction." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993). Therefore, if the exculpatory value of the voicemail was readily apparent to Lieutenant Foley before its destruction, the *Youngblood* test is satisfied.

The Court finds *Zaragoza-Moreira*, 780 F.3d at 977 instructive. In *Zaragoza-Moreira*, the accused—Zaragoza—was arrested at a port of entry after Customs and Border Protection officers found a package containing heroin and methamphetamine on Zaragoza's body. *Id.* at 975. Zaragoza told a Homeland

8

Security Investigations agent that she wanted to get caught because she did not want to bring the drugs into the United States. *Id.* Zaragoza stated that while she was waiting in the admission line at the port of entry, she repeatedly attempted to draw attention to herself so that border inspectors would notice that there was something wrong. *Id.* at 975–76. Surveillance cameras recorded footage of the admissions line at the port of entry.

The Government filed a criminal complaint charging Zaragoza with importing heroin and methamphetamine into the United States. *Id.* at 976. Five days later, Zaragoza's attorney sent a letter to the Government requesting that any videotapes that relate to the arrest or events leading to the arrest of Zaragoza be preserved. *Id.* The following month, the video footage of the day of Zaragoza's arrest was destroyed after it had been automatically recorded over. *Id.* at 977.

The Ninth Circuit found that, while the video footage was not materially exculpatory, it was potentially useful evidence to Zaragoza's duress defense. *Id.* at 977. The court further found that the value of the footage was readily apparent to the agent that interviewed Zaragoza, because Zaragoza repeatedly alerted the agent that she had trafficked the drugs under duress. *Id.* at 978–79.

Here, Defendant is charged with being a prohibited person in possession of a firearm and possession of an unregistered firearm. (Doc. 1.) Both charges require the Government to prove beyond a reasonable doubt that Defendant knowingly

9

possessed the firearms. Firearms-Unlawful Possession-Convicted Felon, Ninth Circuit Model Jury Instructions, Instruction No. 14.16 (2022 Edition) (updated Mar. 2025). The obvious defense to these charges—at least in the Court's view—is that Defendant did not in fact knowingly possess the firearms. Therefore, any evidence that would support that defense or undermine the Government's ability to prove the charges would be readily apparent to Lieutenant Foley.

Lieutenant Foley testified at the hearing that he was not investigating possession of a firearm charges at the time he received the voicemail from Jessen. However, Lieutenant Foley testified that he was nonetheless concerned with who possessed the guns, because a convicted felon's possession of a firearm is "still a concern of law enforcement even though [law enforcement] might not be investigating it." Lieutenant Foley further testified that if it were Chelini that had left the voicemail, he would have wanted to preserve the voicemail. These statements support the finding that the exculpatory value of the voicemail was readily apparent.

### III.    Whether Defendant can Obtain Comparable Evidence through Other Means

The Government contends that Defendant is able to obtain comparable evidence through other means. (Doc. 25 at 9.) Specifically, at the hearing, the Government argued that Lieutenant Foley's recollection is an adequate substitute for the actual voicemail. However, Lieutenant Foley testified that he has received

over a hundred voicemails between June 2024 and the time of his testimony. Lieutenant Foley agreed with Defense counsel that it is hard for him to remember the exact details of each of the voicemails he has received. Lieutenant Foley's recollection of a voicemail he received over a year ago is not comparable to the voicemail itself.

Had the voicemail been preserved, Defendant could have played it for the jury. The jury could analyze Jessen's tone, demeanor, and most importantly, the jury would hear precisely what Jessen said. The voicemail is also the most effective tool for Defendant to impeach Jessen at trial. There is no evidence that adequately compares to the voicemail; therefore, the Government's failure to preserve the voicemail prejudices Defendant's defense.

## CONCLUSION

Jessen's voicemail had readily apparent exculpatory value to Defendant. There is no comparable evidence that Defendant can obtain through other means, and the Government's failure to preserve the voicemail violates Defendant's right to Due Process.

Accordingly, IT IS ORDERED that the motion to dismiss indictment (Doc. 17) is GRANTED.

IT IS FURTHER ORDERED that the motion to dismiss Count 1 (Doc. 15) is DENIED AS MOOT.

        IT IS FURTHER ORDERED that the Clerk of Court shall close this case

file.

        DATED this 29th day of July, 2025.

                                        _____
                                        Dana L. Christensen, District Judge
                                        United States District Court